MARYLAND JOCKEY CLUB OF BALTIMORE, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 21577, 24018.   Promulgated August 16, 1929.

*Elisha Hanson, Esq., George N. Dale, Esq.,* and *B. R. Youngman, Esq.,* for the petitioner.

*J. L. Backstrom, Esq.,* for the respondent.

OPINION.

ARUNDELL: Petitioner claims it is entitled to assessment under section 328 of the Revenue Acts of 1918 and 1921 on the grounds, first, that its invested capital can not be determined and, second, that there existed abnormal conditions affecting its capital and income and resulting in an exceptional hardship.

As to the first ground, it has not been established that invested capital can not be determined. Apparently the respondent has determined the amount of invested capital for each of the years involved although for only one year, 1921, is the amount set forth in the deficiency notices attached to the petitions. A revenue agent's report, placed in evidence by the petitioner, covering the years 1916 to 1920, inclusive, contains the statement that:

A break in the continuity due to the loss of an intermediate ledger made it impossible to give a complete analysis of surplus from the incipiency of the corporation.

This statement does not establish that invested capital can not be determined. Surplus is only one element of invested capital and while, in order to establish the total amount of invested capital it is

perhaps necessary to ascertain the amount of surplus to be included, we do not perceive the necessity of setting up a complete analysis of surplus from the organization of a corporation, which in this case occurred some 13 years before the first of the taxable years involved. The further statement of the revenue agent that a fund resulting from uncashed pari-mutuel tickets could not be allocated to the different years is of little significance because of the lack of proof that this fund is a proper item to be included in invested capital. The agent also reports that it was difficult to determine the amounts attributable to repairs and to construction work and that probably some improvements were destroyed before being completely depreciated, but, in order to avoid any injustice in this respect, the agent says he pursued a " general, liberal, broad policy " and the report continues:

Extremely liberal maintenance charges were allowed that doubtless took care of this factor and a rate of depreciation fixed upon that not only would help in this direction, but, also, permit an inflation of invested capital and give a true representation of actual conditions.

To what extent the respondent followed the agent's report in determining the deficiencies for the years 1919 and 1920 is not shown, but apparently he adopted an even more liberal policy, as the deficiencies determined are considerably less than those reported by the agent.

Petitioner argues that its inability to establish the cost of the pari-mutuel machines demonstrates the fact that invested capital can not be determined. About all the evidence on this point is the testimony of the one witness that the machines were " very expensive." This is a relative term and we have no means of knowing what comparative basis the witness had in mind when he used it. That which to one person's view is " very expensive " may not appear so to another. Moreover, we do not know how the respondent treated the cost of the machines. Neither the revenue agent's report nor the deficiency letters show whether or not any sum was included in invested capital as the cost of the machines. The only reference to the machines that we find in the agent's report for the taxable years is in a schedule showing adjustments of income for the fiscal year 1919, wherein the agent disallowed a claimed expense deduction of $6,540 for pari-mutuel machines and stated that he had capitalized it.

Further, we are not satisfied that petitioner is unable to establish the cost of the pari mutuels. The agent's report speaks of the " the loss of an intermediate ledger." A ledger is a secondary record and its loss does not establish the nonexistence of primary records from which cost might be determined.

\* \* \* A taxpayer should be held to a reasonable diligence in determining his invested capital, and it is only after a showing of reasonable diligence and the resulting inability then to establish his invested capital that the relief provisions will be applied on this account. *Cramer & King*, 13 B. T. A. 399. See, also, *Union Drawn Steel Co.*, 15 B. T. A. 761.

Under petitioner's second ground for asking special assessment, namely, abnormalities affecting capital and income, several claims are made. It is argued that by the installation of the pari mutuels petitioner acquired an intangible asset of substantial value in that it thereby counteracted the antagonism that was growing against racing under the bookmaking system, it was better able to serve the public, it could and did pay larger purses, and greatly increased its income. This intangible, it is said, is excluded from invested capital. As pointed out above, we do not know what items the respondent has excluded from invested capital. But even assuming that no amount has been included on account of the alleged valuable intangible, we are not satisfied that this results in an abnormality. We know that as a result of the change in the betting system petitioner's income increased and that it increased the size of the purses. But in this we fail to see any abnormality. It appears rather that the change from the bookmaking to the pari-mutuel system was merely "the application of good business judgment" as in *Wisconsin Butter & Cheese Co.*, 10 B. T. A. 852, where the adoption of a particular method of marketing proved to be more economical than other means that it might have used.

We see nothing abnormal in the fact that petitioner operated the Pimlico track under leases, the consideration for which was apparently agreed upon in arm's-length negotiations. There is some argument on the fact that under the leases, improvements which petitioner placed on the property at its expense became the property of the lessor. This is not an abnormal condition; it is a customary provision of real property leases. Moreover, we find upon reference to the revenue agent's report that for the years 1919 and 1920 he increased invested capital by the respective amounts of $57,222.45 and $129,691.94 for improvements.

Whether a monoply created by law would result in such an abnormality as to allow special assessment need not be considered. The law enacted in 1920, to which petitioner points as giving it a statutory protection from competition within a certain area, allows three other one-mile tracks to operate within the State of Maryland, and in addition thereto permits races to be conducted at county fairs and agricultural exhibits.

The mere fact that petitioner's profits were high in the taxable years does not entitle it to special assessment, as section 327 (d) provides that it,

shall not apply to any case (1) in which the tax * * * is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital * * *.

Whether petitioner had a " normal invested capital " in the taxable years is not shown. In fact only for one year, namely, 1921, do we know the amount of its invested capital, and that we have found from the respondent's deficiency notice. In that year petitioner's income, as determined by respondent, was about 30 per cent of its invested capital. While this on its face appears to be a rather high return, we do not know whether the invested capital upon which it was earned was a normal or abnormal amount in the business in which petitioner was engaged.

*Judgment will be entered for the respondent.*